J-A18010-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: H.A.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: A.W., MOTHER | : | |
| | : | No. 477 EDA 2025 |

Appeal from the Decree Entered January 28, 2025
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000271-2023

| | | |
|---|---|---|
| IN THE INTEREST OF: C.M.A., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: A.W., MOTHER | : | |
| | : | No. 478 EDA 2025 |

Appeal from the Decree Entered January 28, 2025
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000272-2023

| | | |
|---|---|---|
| IN THE INTEREST OF: S.L.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: A.W., MOTHER | : | |
| | : | No. 479 EDA 2025 |

Appeal from the Decree Entered January 28, 2025
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000470-2023

BEFORE: OLSON, J., DUBOW, J., and BECK, J.

MEMORANDUM BY OLSON, J.:        **FILED SEPTEMBER 25, 2025**

A.W. ("Mother") appeals from the January 28, 2025 decrees involuntarily terminating her parental rights to her three natural children: her son, H.A.W., born in October 2017; and her daughters, C.M.A. a/k/a C.-M.A., born in January 2013, and S.L.W., born in July 2021 (collectively, "the Children").[1] After review, we affirm.

We glean the following factual and procedural history from the certified record. The Philadelphia Department of Human Services ("DHS" or "the Agency") received a report in approximately September 2019, which alleged that Mother "provided C.M.A. adult medication to help her sleep." N.T., 1/28/25, at 15-16; DHS Exhibit 2 at 2-3. Mother acknowledged providing C.M.A. with steadily increasing doses of "Abilify," which had been prescribed for Mother. *See* DHS Exhibit 2 at 2-3. DHS learned that Mother had a history of mental health diagnoses, including diagnoses of bipolar depression, autism, attention deficit hyperactivity disorder, and obsessive compulsive disorder. *See* N.T., 1/28/25, at 19; DHS Exhibit 2 at 2, 5, 10. Subsequent to incidents of domestic violence in the home, H.A.W. and C.M.A. were removed and

---

[1] The trial court also entered decrees voluntarily terminating the parental rights of M.S., the father of H.A.W. and S.L.W., on November 13, 2024; and involuntarily terminating the parental rights of all unknown putative fathers on January 28, 2025. On the same date, the trial court continued the matter with regard to K.A., the father of C.M.A.

placed with their maternal grandmother under a safety plan.[2]  ***See*** DHS Exhibit 2 at 2-3.

On November 21, 2019, the court adjudicated C.M.A. and H.A.W. dependent and committed them to the custody of DHS.  ***See*** N.T., 1/28/25, at 15-16; DHS Exhibit 1, Orders of Adjudication and Disposition, 11/21/19. The Children were formally placed in kinship care with their maternal grandmother, who is a pre-adoptive resource, where they had remained for more than five years at the time of the subject hearing.  ***See*** N.T., 1/28/25, at 28, 32; DHS Exhibit 1, Orders of Adjudication and Disposition, 11/21/19. We note that C.M.A. and H.A.W. both have autism and individualized educational plans in school.  ***See*** N.T., 1/28/25, at 27-29.  Further, at the time of his adjudication, it was undisputed that H.A.W. was developmentally delayed and receiving occupational and physical therapy.  ***See*** DHS Exhibit 1.

The court established C.M.A.'s and H.A.W.'s respective permanency goals as reunification with Mother.[3]  In furtherance thereof, the court referred Mother to Behavioral Health Services ("BHS") for consultation, evaluation, and

---

[2] We note that DHS had been familiar with this family since January 2018, when the Agency received a report alleging that Mother's apartment did not have heat.  ***See*** DHS Exhibit 2 at 2.  As a result, DHS instituted Community Umbrella Agency ("CUA") services and temporarily placed H.A.W. and C.M.A. with their maternal grandmother before returning them to Mother's care at a time unspecified, but prior to September 2019.  ***See id.***

[3] The court noted concurrent goals of permanent legal custody in January 2023, and adoption in August 2023.  ***See*** DHS Exhibit 1.

monitoring; and to the Achieving Reunification Center ("ARC") for "appropriate services."  DHS Exhibit 1, Orders of Adjudication and Disposition, 11/21/19. Mother was then engaged in services, including mental health treatment.  *See id.*  The court further provided for liberal supervised visitation.  *See id.*

Corresponding to the terms set forth by the court at the time of adjudication, DHS and/or CUA established single case plan ("SCP") objectives requiring Mother to, *inter alia*:  attend parenting class; allow CUA to complete a home assessment; engage in mental health treatment; and participate in visitation.  *See* N.T., 1/28/25, at 16, 18.

The court held permanency review hearings with respect to H.A.W. and C.M.A. at regular intervals at which it consistently maintained their commitment and placement.  The court referred Mother for a parenting capacity evaluation, and repeatedly referred Mother to BHS for consultation, evaluation, and monitoring, and to ARC for housing and domestic violence services.  *See* DHS Exhibit 1.

Mother gave birth to S.L.W. in July 2021.  *See* DHS Exhibit 2 at 2. S.L.W. remained in Mother's care thereafter, and the record is silent as to any Agency involvement regarding her, until August 2023, described *infra*.

In August 2021, in connection with H.A.W.'s and C.M.A.'s dependency matters, Dr. William Russell issued a parenting capacity evaluation, concluding

that Mother was "not able to provide a safe environment for the Children."[4] DHS Exhibit 2 at 9. He recommended that Mother engage in Dialectical Behavior Therapy ("DBT");[5] follow the CUA recommendations and service plan; maintain stable and appropriate housing; and develop a better understanding of child functioning. *See id.* at 10; N.T., 1/28/25, at 70-71.

Thereafter, by January 2023, the court found Mother achieved minimal compliance with the permanency plan and made no progress in alleviating the causes of the Children's placement. *See* DHS Exhibit 1. On July 24, 2023, DHS filed petitions for the involuntary termination of Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b) with respect to H.A.W. and C.M.A.

In August 2023, DHS obtained temporary custody of S.L.W., then two years old, after it became aware (in an unspecified manner) of unexplained bruises appearing on S.L.W.'s face and arm, as well as human bites all over

---

[4] Dr. Russell defined a parenting capacity evaluation as "an evaluation of an individual's ability to provide an environment that's safe and conducive to [a] child['s] development." N.T., 1/28/25, at 66. His evaluation was admitted as DHS Exhibit 2, without objection. *See id.* at 73-74.

[5] According to Dr. Russell, DBT is

> a therapy that's . . . geared towards presenting individuals with real life situations in various scenarios in attempting to have their emotional state trying to cope with it and do that in both individual and group sessions so that it's a much more reality[-]based kind of treatment as opposed to one looking for insight development.

*Id.* at 76-77.

her body.[6]  *See* N.T., 1/28/25, at 24, 35; DHS Exhibit 1, Order of Adjudication and Disposition, 10/3/23.  On October 3, 2023, following a hearing, the court adjudicated S.L.W. dependent and fully committed her to the custody of DHS.  *See id.*  The court indicated that S.L.W. was then "non[-]verbal" and "severely delayed" developmentally.  DHS Exhibit 1, Order of Adjudication and Disposition, 10/3/23.  S.L.W. was placed in a pre-adoptive kinship home separate from H.A.W. and C.M.A., where she has remained.  *See* N.T., 1/28/25, at 32.

The court established S.L.W.'s initial permanency goal as reunification and, in furtherance thereof, ordered Mother to obtain another parenting capacity evaluation; attend BHS for an evaluation and/or consultation; attend the Clinical Evaluation Unit ("CEU") for drug and alcohol screening; and participate in parenting services through ARC.  *See* DHS Exhibit 1, Order of Adjudication and Disposition, 10/3/23.  The court further ordered the CUA to conduct a home assessment as Mother's housing also remained a concern.  *See id.*; N.T., 1/28/25, at 25-26.  The court granted Mother line-of-sight and line-of-hearing supervised visitation with S.L.W. and, as best we can discern, directed Mother's supervised visitation with H.A.W. and C.M.A., which had transitioned to the Agency, to also become line-of-sight and line-of-hearing at or around this time.  *See* DHS Exhibit 1; N.T., 1/28/25, at 20.

---

[6] The record does not reveal the result of the Agency's investigation into S.L.W.'s injuries.

Throughout 2024, Mother participated in 10 of 52 possible visits with the Children. *See* N.T., 1/28/25, at 19, 36-37. Also, Mother has an unspecified sexually transmitted disease that is transmissible through bodily fluids which concerned the CUA during visits because Mother shared food with the Children and helped them blow up balloons, against the admonition of the CUA. *See* N.T., 1/28/25, at 20-21, 35, 49-50, 57-58. Additionally, the Children became ill from food items brought by Mother. *See id.* at 20, 35. As a result, the court issued multiple directives prohibiting Mother from bringing food to the visits or any items that would risk transmitting her bodily fluids. The court further forbade Mother from taking the Children to the bathroom and/or undressing them, which will be addressed more fully herein. *See id.* at 20-23, 39, 56-58; DHS Exhibit 1. Pursuant to its order of October 1, 2024, the court documented that Mother had not visited the Children since May 2024 and reduced her visitations from weekly to biweekly. *See* DHS Exhibit 1, Permanency Review Order, 10/1/24.

On October 25, 2024, DHS filed a petition for the involuntary termination of Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b) with respect to S.L.W. On January 28, 2025, the trial court conducted an evidentiary hearing with respect to all of DHS's petitions to involuntarily terminate Mother's parental rights. Mother was present and represented by counsel at the proceeding.

H.A.W. and C.M.A., then seven and twelve years old, respectively, were represented by their guardian *ad litem* ("GAL") from the underlying dependency proceedings, Susan Rubinovitz, Esquire, and separate legal interests counsel, Neil Krum, Esquire. S.L.W., then three years old, was also represented by Attorney Rubinovitz, who served as the child's dual GAL and legal interest counsel.[7]

_____

[7] Our Supreme Court has held that "appellate courts should engage in *sua sponte* review to determine if orphans' courts have appointed counsel to represent the legal interests of children in contested termination proceedings, in compliance with" 23 Pa.C.S.A. § 2313(a). ***In re Adoption of K.M.G.***, 240 A.3d 1218, 1235 (Pa. 2020). Further, if the orphans' court appoints one attorney "to represent both the child's best interests and legal interests, [then, prior to appointment,] appellate courts should review *sua sponte* whether the [trial] court made a determination that those interests did not conflict." ***Id.*** at 1235-1236. However, the Court recognized that "if the preferred outcome of a child is incapable of ascertainment because the child is very young and pre-verbal, there can be no conflict between the child's legal interests and his or her best interests; as such, the mandate of Section 2313(a) of the Adoption Act . . . is satisfied where the court has appointed an attorney-GAL who represents the child's best interests during such proceedings." ***In re T.S.***, 192 A.3d 1080, 1092-93 (Pa. 2018).

Pursuant to its August 8, 2023 permanency review orders, the trial court directed the court's legal liaison to appoint legal interest counsel for H.A.W. and C.M.A. ***See*** DHS Exhibit 1, Permanency Review Orders, 8/8/23. While a formal appointment of Attorney Krum as legal interests counsel is not contained in the certified record, it is clear that Attorney Krum served in that capacity in these legal proceedings. Accordingly, we discern no actionable legal error with respect to the legal representation of H.A.W. and C.M.A. ***See*** ***T.S.***, 192 A.3d at 1090 n.19 (recognizing that it would "be a better practice for the court to place an order on the record formalizing the GAL's role for termination purposes" but declining "to elevate form over substance" in circumstances when it was clear that the child received appropriate legal representation despite the absence of an appointment order.). As to S.L.W., despite the absence of a formal order appointing Attorney Rubinovitz in a dual

*(Footnote Continued Next Page)*

At the commencement of the hearing, the court granted a continuance with respect to C.M.A.'s father. *See* N.T., 1/28/25, at 7-9. Given that the hearing was continued as to C.M.A.'s father, Mother asked to bifurcate her defense of the petitions because her current mental health therapist, Barbara Johnson, was unavailable on the first day of trial. The court denied Mother's request. *See id.* at 9-10.

DHS presented the testimony of CUA supervisor, Kenneth Bradham; former CUA case manager, Terrance Mollock; and Dr. Russell, who the parties previously stipulated as an expert. *See id.* at 15, 65-66. Mother presented the testimony of Sylvia Luzzio, her former therapist. Additionally, the parties ultimately entered stipulations as to the testimony of Irene Brantley, program director of the domestic violence program, Women in Transition; and Maria Pastoria, Parent Child Interactive Therapy ("PCIT") program coordinator at Greenridge Counseling Center.

By decrees dated and entered on January 28, 2025, the trial court involuntarily terminated Mother's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[8] Mother timely filed separate notices of appeal, along with concise statements of errors complained of on

_____

role, again, we observe no error with respect to her legal representation. ***See id.*** Thus, we find no structural error with respect to Section 2313(a).

[8] At the conclusion of the subject hearings, both the Children's legal interest counsel and GALs joined in DHS's argument in support of termination of Mother's parental rights. *See* N.T., 1/28/25, at 109.

- 9 -

appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), which this Court consolidated *sua sponte* on March 7, 2025. The trial court filed a responsive Rule 1925(a) opinion on March 26, 2025.

On appeal, Mother raises the following issues for our review:

1. Whether the trial court erred in terminating Mother's parental rights under 23 Pa.C.S.A. Section 2511(a)(1), the evidence having been insufficient to establish a settled purpose of relinquishing parental claim, or having refused or failed to perform parental duties?

2. Whether the trial court erred in terminating Mother's parental rights under 23 Pa.C.S.A. Section 2511(a)(2), the evidence having been insufficient to establish Mother caused [the Children] to be without essential parental care, nor could that not have been remedied?

3. Whether the trial court erred in terminating Mother's parental rights under 23 Pa.C.S.A. Section 2511(a)(5), the evidence having been insufficient to establish conditions having led to placement continued to exist, nor could [that] not have been remedied?

4. Whether the trial court erred in terminating Mother's parental rights under 23 Pa.C.S.A. Section 2511(a)(8), the evidence having been insufficient to establish conditions having led to placement continued to exist?

5. Whether the trial court erred in terminating Mother's parental rights under 23 Pa.C.S.A. Section 2511(b), the evidence having been insufficient to establish termination of parental rights would best serve the needs and welfare of [the Children]?

6. Additionally, whether the trial court's decision under above Sections 2511(a)(1), (2), (5), [and] (8), inclusively, as well as under 2511(b), is submitted as having been contrary to the weight of the evidence?

7. Whether the trial court erred in permitting into evidence the documents pertaining to all the prior dependency court orders - those not having been certified?

8. Whether the trial court erred in allowing into evidence matters expressed out of court (hearsay) through testimony of Social Work Supervisor, Kendall Bradham? Moreover, [Mother] requests leave to amend as to specific statements upon transcription of the official record.

9. Whether the trial court erred in not granting [Mother's] motion to bifurcate, pursuant to request for additional listing so that material witness Barbara Johnson (who had been under subpoena) may give testimony?

10. As to above, whether the trial court erred in not allowing admission into evidence Mother's proposed Exhibit #2, letter from said prospective witness Ms. Johnson?

11. Moreover, whether the trial court erred as to the denial of due process regarding the court's inconsistent rulings - specifically concerning said evidentiary matters, as well as to the request for bifurcation, etc.? ([Mother] again seeks leave to amend pursuant to details upon transcription of the official record)?.

Mother's Brief at 6-8 (cleaned up) (reordered for ease of disposition).[9]

**Involuntary Termination of Parental Rights**

Mother's first six issues challenge the sufficiency and weight of the evidence to support the trial court's involuntary termination of Mother's parental rights pursuant to Section 2511(a)(1), (2), (5), (8), and (b). Our standard of review in this context is well-established:

> In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an

_____

[9] The Children's respective counsel have not submitted briefs in this appeal.

- 11 -

appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa. Super. 2022) (internal citations and quotation marks omitted).

The involuntary termination of parental rights is governed by Section 2511 of the Adoption Act, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination. *Id.* at 830; *see also* 23 Pa.C.S.A. § 2511(a)(1)-(11). If the orphans' court determines the petitioner has established grounds for termination under one of these subsections by "clear and convincing evidence," the court then assesses the petition pursuant to Section 2511(b), which focuses upon the child's developmental, physical, and emotional needs

and welfare. ***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013); ***see also*** 23 Pa.C.S.A. § 2511(b). This Court need only agree with the trial court's determination as to any one subsection of Section 2511(a), in addition to Section 2511(b), in order to affirm termination. ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

We shall analyze the decrees involuntarily terminating Mother's parental rights to the Children pursuant to Section 2511(a)(2) and (b), which provide as follows:[10]

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings,

---

[10] By analyzing Section 2511(a)(2), we render no conclusions as to the validity of the trial court's findings under Section 2511(a)(1), (5), or (8). ***See In re K.R.***, 200 A.3d 969, 979 (Pa. Super. 2018) (*en banc*) (observing this Court may proceed to a review of one subsection of § 2511(a) "[w]ithout considering the orphans' court's determinations" under any other subsection). Therefore, we need not address Mother's first, third, or fourth claims for relief.

income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

To prove the applicability of Section 2511(a)(2), the party petitioning for termination must establish: "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021) (citation omitted). Grounds for termination pursuant to Section 2511(a)(2), however, "are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." *Id.* (citation omitted). We have long recognized that "[p]arents are required to make diligent efforts towards the reasonably prompt assumption of full parental duties." *Id.* (citation omitted).

In Mother's first pertinent claim for relief, she assails the trial court's finding that her "inaction regarding her SCP[ objectives] serves as clear and convincing evidence to terminate [her] parental rights" pursuant to Section 2511(a)(2). Trial Court Opinion, 3/26/25, at 6-7. While Mother acknowledges the testimony of record established her lack of compliance with her SCP objectives, she asserts that any lack of compliance with the Agency and the juvenile court overseeing the Children's dependency cases was "not *prima*

- 14 -

*facie* evidence" of parental incapacity pursuant to Section 2511(a)(2). Mother's Brief at 20 (internal citations omitted). Moreover, Mother highlights her "active[] engage[ment]" in visitation; participation in therapy, including DBT; completion of a domestic violence program; and the family's graduation from PCIT. *Id.* at 20-21. She contends that such actions are "in direct contradiction to the assertion of [her] having lacked . . . the basic ability to parent." *Id.* at 21. We must disagree.

Upon review, the certified record supports the termination of Mother's parental rights pursuant to Section 2511(a)(2). Specifically, Dr. Russell opined that Mother "was not able to provide a safe environment for the children." N.T., 1/28/25, at 67. He indicated, "Throughout the evaluation [Mother] provided minimal insight into how dangerous her behavior [related to providing C.M.A. unprescribed Abilify] was. This limited insight impacts her judgment and creates risk for her children." DHS Exhibit 2 at 8. Dr. Russell further explained:

> When you look at [Mother] she has a lengthy history, developmental history of trauma, of physical abuse, sexual abuse, out-of-home placement, mental [health] treatment [and] mental [health] placements. [H]er adult life pretty [much] mimics that entire childhood.
>
> Her adult life, her young adult life consists of physical abuse in the form of domestic violence.
>
> She has ongoing mental health treatment, ongoing mental health needs. She's been prescribed medication, including the Abilify for approximately 7, 8 years.

> She has been attending various mental health treatment facilities. She had a history of unstable relationships, again, including domestic violence.
>
> The entire presentation of [Mother] reflected her mental health issues.
>
> During the time I spent with her she had [great difficulty in] staying on top [of] providing coherent explanations for different activities in her life. And all of that combines to create a situation that leads to unsafe environment for a child.

N.T., 1/28/25, at 69-70.

Moreover, Dr. Russell testified that Mother had not demonstrated any period of stability. *See id.* at 71. Indeed, he indicated that Mother's limited visitation in 2024 is reflective of instability. *See id.* at 72-73. He opined, "I think it reflects her inability to maintain consistency in any area of her life which is one of the most important factors in child safety. A child needs stability to grow and develop normally." *Id.* at 72-73. Dr. Russell therefore testified Mother has made "no progress," insofar as there is "no evidence of any change in [Mother's] presentation from the time I saw her to today." *Id.* at 71-72. As a result, he opined that the Children could not be safely reunified with Mother. *See id.* at 73.

Similarly, Mr. Bradham and Mr. Mollock testified to having safety concerns for the Children related to Mother's mental health. *See id.* at 19, 26-27, 53, 55, 58. Both confirmed Mother's failure to sign current mental health releases, which caused an inability to verify Mother's mental health progress and treatment. *See id.* at 19, 53. Mr. Mollock further testified that

Mother "showed a lot of aggression towards myself and the CUA case management staff as a whole, as well as towards her mother, the kinship provider [for H.A.W. and C.M.A.]." ***Id.*** at 53. This included making unfounded allegations of abuse and neglect. ***See id.*** at 22-23, 53, 59-61.

In addition, Mr. Mollock testified that Mother has refused in the underlying matter to allow the CUA to conduct a home assessment. ***See id.*** at 26. Further, Mother failed to sign the specific releases which were required for her to obtain the court-ordered updated parental capacity evaluation. ***See id.*** at 26-27, 55. As a result, Mr. Bradham and Mr. Mollock questioned Mother's ability to care for the Children on a full-time basis. ***See id.*** at 24, 31-32, 55.

To the extent that Mother argues that the trial court disregarded evidence of her positive interactions with the Children during visitation; her participation in mental health therapy; her completion of a domestic violence program; and her participation in PCIT, we reiterate that we do not disturb the trial court's determinations, including the trial court's findings of fact and determinations regarding credibility and weight of the evidence, absent an abuse of discretion. ***See*** Mother's Brief at 25; ***M.E.***, 283 A.3d at 829-30. "As the ultimate trier of fact, the [trial] court is empowered to make all determinations of credibility, resolve conflicts in the evidence, and believe all, part, or none of the evidence presented." ***In re N.A.M.***, 33 A.3d 95, 99 (Pa. Super. 2011) (citation omitted).

Hence, we discern no abuse of discretion by the trial court in concluding that termination of Mother's parental rights pursuant to Section 2511(a)(2) was warranted. The record amply supports the trial court's conclusion that Mother's repeated and continued incapacity has caused the Children to be without essential parental care, control or subsistence necessary for their physical and mental well-being. *See A.H.*, 247 A.3d at 443. Moreover, the record confirms that the causes of Mother's incapacity cannot or will not be remedied inasmuch as H.A.W. and C.M.A. had been in care for over five years, and S.L.W. for approximately fifteen months. Yet, Dr. Russell opined that the Children could still not be safely reunified with Mother. *See id.*; N.T., 1/28/25, at 24, 28, 32, 71-73; *see generally* DHS Exhibit 1.

Since the record supports the trial court's conclusion that adequate grounds for termination existed pursuant to at least one subsection of Section 2511(a), we now turn to review Mother's next claim concerning the court's findings pursuant to Section 2511(b), which gives "primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b); *see also T.S.M.*, 71 A.3d at 267. Our Supreme Court has generally outlined this inquiry, as follows:

> [C]ourts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent.
>
> Accordingly, the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis. We have observed the law regarding termination of parental rights should not be applied

- 18 -

mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. Thus, the court must determine each child's specific needs.

Moreover, the child's emotional needs and welfare include intangibles such as love, comfort, security, and stability. As further guidance, we have identified factors, *i.e.*, specific needs and aspects of the child's welfare, that trial courts must always consider. The courts must consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents. And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which is not always an easy task.

*Interest of K.T.*, 296 A.3d 1085, 1105-06 (Pa. 2023) (cleaned up).

"The extent of any bond analysis . . . necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008) (citation omitted). However, our Supreme Court has concluded that "only a necessary and beneficial" parental bond should be maintained. *K.T.*, 296 A.3d at 1009. A bond is considered to be "necessary and beneficial" if its severance would cause "extreme emotional consequences" or significant, irreparable harm. *Id.* at 1109-10. This Court has recognized that,

concluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent. . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of

- 19 -

> parenthood is more important in terms of the development of the child and [the child's] mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted).

Furthermore, "bond, plus permanency, stability and all 'intangible' factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and thus are all of 'primary' importance in the Section 2511(b) analysis." *K.T.*, 296 A.3d at 1109. Therefore, it is "within the discretion of the orphans' court to prioritize the safety and security" of children "over their bonds with their parents. *M.E.*, 283 A.3d at 839 (cleaned up).

In determining that termination served the Children's developmental, physical, and emotional needs and welfare pursuant to Section 2511(b), the trial court concluded that "all of [the Children's] necessary and particular needs [are] being addressed" by their kinship caregivers, with whom they are "well-bonded." Trial Court Opinion, 3/26/25, at 7-8.

While Mother concedes that the Children are "thriving" in their current placements, she asserts that, assuming the court abused its discretion pursuant to Section 2511(a), it erred in applying Section 2511(b), which does not provide an independent basis for termination of parental rights. She argues that

> the statutory language [of Section 2511(b)] under no circumstances could form a basis for losing one's parental rights,

and would therefore **not** give rise to independent grounds. A trial court only "engage[s] in the second part of the analysis pursuant to Section 2511(b) . . . if the court determines that the parent's conduct warrants termination of his or her parental rights." [*In re Adoption of A.C.*], 162 A.3d 1123 (2017) (citation omitted). [Mother] thus avers as to not being subject to involuntary termination pursuant to Section 2511(b) alone.

Mother's Brief at 22 (emphasis added).

Mother's claim fails to the extent that it is premised upon the Agency failing to meet its evidentiary burden under Section 2511(a). In addition, we conclude that the trial court's findings pursuant to Section 2511(b) are supported by the certified record, and free from legal error.

Specifically, we observe that Mother's visitation remained supervised and her visitation was further restricted in approximately October 2023 to line-of-sight and line-of-hearing as she failed to comply with the instruction not to bring food and other items to the visits. *See id.* at 19-22, 35-36, 56-58. In addition, Mother's visitation was reduced in this way because she engaged in other inappropriate behavior, such as, according to Mr. Bradham, "mocking the staff, asking the kids, are they safe, are they being abused, telling the staff that [the CUA staff are] stealing [her children.]" *Id.* at 22-23. Moreover, Mother would undress the Children and "take pictures of [them] nude and make false allegations [of] abuse." *Id.* at 23, 35-36, 62. Mr. Mollock observed that H.A.W., "in particular[, was] uncomfortable [with Mother's action in this regard] and often times he g[ot] upset about it, might end [up] crying to where the visit would be stopped by it at that point." *Id.*

- 21 -

at 62. Finally, Mother's conduct during supervised visitation wasn't appropriate with respect to S.L.W., whom Mr. Mollock described "was in the process of being potty trained, but [Mother] would make her sit on the potty for the duration of the visit, that was three plus hours." *Id.* at 57. He continued, "[S.L.W.] became upset where we had to comfort her, and then after that, you know, it took about 20 to 30 minutes to calm her down . . .." *Id.* at 62.

Finally, Mother's participation in visitation became inconsistent in 2024, when she only attended 10 out of 52 scheduled visits. *See id.* at 19, 30, 36-37. Despite some "positive interaction[s]" and recognition of Mother as their mom, Mr. Mollock testified that the Children "know that [Mother] isn't able to care for them right now." *Id.* at 61. Mr. Bradham testified that the Children have suffered no harm as a result of Mother's minimal visitation during 2024. *See id.* at 30. Further, both Mr. Bradham and Mr. Mollock indicated that there were no issues with the Children separating from Mother at the end of visits that did occur. *See id.* at 30, 46, 54, 61.

Conversely, Mr. Bradham and Mr. Mollock testified that H.A.W. and C.M.A. share their primary parent-child bond with their maternal grandmother, who provides love, safety, stability and support and meets their specialized needs. *See id.* at 27-29, 37-38, 54.

Likewise, Mr. Bradham testified that S.L.W. shares a "strong parent[-]child bond" with her kinship caregiver. *Id.* at 37. Further, he

testified that the kinship caregiver provides love, safety, stability, and support and meets her special medical needs involving swallowing difficulties, the specifics of which are not in the record. *See id.* at 30-31, 33.

As such, both Mr. Bradham and Mr. Mollock testified that the Children would not suffer irreparable harm if Mother's parental rights were terminated. *See id.* at 32-33, 56. They further opined that the Children deserve permanency, and it is in the Children's best interests to terminate Mother's parental rights and change their permanency goals to adoption. *See id.* at 31-33, 38, 56, 58, 60.

Based on the foregoing, we discern no abuse of discretion with the trial court's conclusion that terminating Mother's parental rights will serve the Children's developmental, physical, and emotional needs and welfare pursuant to Section 2511(b). The record amply demonstrates that the Children share a necessary and beneficial relationship with their pre-adoptive kinship caregivers and not Mother. *See K.T.*, 296 A.3d at 1109-10, 1113. While Mother may profess to love the Children, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (citation omitted).

**Admission of Evidence**

We next turn to Mother's seventh and eighth issues which are evidentiary in nature. Our standard of review is well settled:

> The admission of evidence is a matter vested within the sound discretion of the trial court, and such a decision shall be reversed

only upon a showing that the trial court abused its discretion. An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record.

*Wilson v. Smyers*, 284 A.3d 509, 514 (Pa. Super. 2022) (citations and quotation marks omitted).

In her seventh issue, Mother asserts that the court abused its discretion by admitting into evidence the Children's dependency orders which were neither certified as required by Pa.R.E. 902(4) nor otherwise authenticated. *See* Mother's Brief at 22.

As to the authentication of evidence, this Court has recognized:

"[u]nless stipulated, to satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Pa.R.E. 901(a). "Generally, authentication requires a low burden of proof." *Commonwealth v. Jackson*, 283 A.3d 814, 818 (Pa. Super. 2022). Nevertheless, the threshold inquiry of authentication must be satisfied prior to admission of any evidence. [*See*] *Commonwealth v. Mangel*, 181 A.3d 1154, 1158-59 (Pa. Super. 2018). The party introducing the evidence may establish its authenticity through the testimony of a witness with knowledge that "the item is what it is claimed to be." Pa.R.E. 901(b)(1). Alternatively, the party may establish the authenticity of the evidence through other methods . . ., such as through authentication or identification allowed by a statute or rule promulgated by our Supreme Court. Pa.R.E. 901(b)(10).

To this end, Rule 902 states the following, in relevant part:

The following items of evidence are self-authenticating; they require no extrinsic evidence of authenticity in order to be admitted:

. . .

**(4) Certified Copies of Public Records**. A copy of an official record—or a copy of a document that was recorded or filed in a public office as authorized by law—if the copy is certified as correct by:

(A) the custodian or another person authorized to make the certification; or

(B) a certificate that complies with Rule 902(1), (2), or (3), a federal statute, or a rule prescribed by the Supreme Court.

Pa.R.E. 902(4).

Pennsylvania's statute governing the admissibility of official records into evidence, including court orders, provides the following:

**§ 6103. Proof of official records**.

**(a) General rule**.--An official record kept within this Commonwealth by any court, magisterial district judge or other government unit, or an entry therein, when admissible for any purpose, may be evidenced by an official publication thereof or by a copy attested by the officer having the legal custody of the record, or by that officer's deputy, and accompanied by a certificate that the officer has the custody. The certificate may be made by any public officer having a seal of office and having official duties with respect to the government unit in which the record is kept, authenticated by the seal of that office, or if there is no such officer, by:

. . .

(2) The clerk of the court of common pleas of the judicial district embracing any county in which the government unit has jurisdiction, in the case of any government unit other than a Commonwealth agency.

42 Pa.C.S.A. § 6103(a)(2). The purpose of Section 6103 is to provide a method to introduce official records "without the need for bringing the records custodian into court to authenticate the records." *Thorne v. Dep't of Transp*., 727 A.2d 1205, 1207 (Pa. Cmwlth. 1999).

- 25 -

*Interest of I.D.M.A.*, 544 EDA 2025, 2025 WL 2181448, at *7-8 (Pa. Super. filed August 1, 2025) (unpublished mem.).

Here, counsel for Mother placed an objection on the record to the admission of the dependency orders as they were not certified. *See* N.T., 1/28/25, at 51. The trial court overruled the objection, indicating that the orders are "part of the record."[11] *Id.* In its Rule 1925(a) opinion, the trial court reasoned that it did not err by admitting the uncertified dependency orders based upon the business records exception to the hearsay rule because the CUA case manager, the custodian of the documents, "provided sufficient information relating to the preparation and maintenance of the record to offset the hearsay character of the evidence."[12] Trial Court Opinion, 3/26/25, at

_____

[11] We observe that dependency proceedings and termination proceedings are two separate, distinct proceedings "with their own docket numbers, records, and divisions within the Court of Common Pleas." *Interest of S.S.*, 252 A.3d 681, 688 (Pa. Super. 2021).

[12] "Hearsay" is defined as a statement that "the declarant does not make while testifying at the current trial or hearing," and which "a party offers in evidence to prove the truth of the matter asserted in the statement." Pa.R.E. 801(c)(1)-(2). Rule 803(6) provides for the hearsay exception regarding "Records of a Regularly Conducted Activity," or business records, which states the following:

> The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:
>
> . . .

*(Footnote Continued Next Page)*

9-10 (quoting Pa.R.E 803(6)). However, the trial court conflates authentication with hearsay. Mother's counsel objected to, and preserved for appeal, the admission of the dependency orders based upon a lack of authentication, not hearsay. *See Commonwealth v. Manivannan*, 186 A.3d 472, 480 (Pa. Super. 2018) (recognizing that a document must first satisfy requirements of authentication prior to ruling on its admissibility under the business records exception to the rule against hearsay); *see also Commonwealth v. Koch*, 106 A.3d 705, 711 (Pa. 2014) (if proponent cannot

---

(6) **Records of a Regularly Conducted Activity.** A record (which includes a memorandum, report, or data compilation in any form) of an act, event or condition if:

(A) the record was made at or near the time by-- or from information transmitted by--someone with knowledge;

(B) the record was kept in the course of a regularly conducted activity of a "business", which terms includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit;

(C) making the record was a regular practice of that activity;

(D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

(E) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

Pa.R.E. 803(6).

prove that evidence is what it purports to be, authentication challenge succeeds and evidence cannot be admitted, regardless of its potential relevance, and hearsay assessment will not be undertaken). Thus, the trial court failed to address the nature of Mother's objection, *i.e.*, authentication pursuant to Pa.R.E. 902(4).

Instantly, DHS attempted to admit court orders from the Children's separate dependency matters without obtaining the requisite certified copies. The Agency did not seek to establish the authenticity of the orders through any of the methods provided by Section 901(b), such as through a witness with proper knowledge. DHS did not establish that the orders were copies of official orders entered in the Children's respective dependency matters and maintained in the official docket of that matter. Counsel merely introduced the orders *en masse* without further foundation. **See** N.T., 1/28/25, at 51. As such, we conclude the Children's dependency orders were improperly admitted at the involuntary termination proceedings.

Notwithstanding, an evidentiary error is harmless if it "could not have had any impact upon the [trial] court's decision." **In re A.J.R.-H**., 188 A.3d 1157, 1175 (Pa. 2018). There is nothing in the trial court's opinion to suggest that it relied upon the uncertified dependency orders in terminating Mother's parental rights. For the most part, the orders contain boilerplate language and lack substantive factual findings. Moreover, any information they do present is largely duplicative of other evidence. Thus, we conclude that the

orders did not affect the trial court's decision, and their erroneous admission was harmless. *See id.* Thus, Mother's claim fails.

In her eighth issue, Mother asserts that the trial court abused its discretion by finding Mr. Bradham's testimony admissible with respect to (1) the Children's adjudication and circumstances for coming into care and (2) certain aspects related to her supervised visitation.[13] *See* Mother's Brief at 23-24. Mother placed objections on the record to these aspects of Mr. Bradham's testimony on the basis of inadmissible hearsay.

_____

[13] In total, Mother challenged the following testimony: Mother gave medication to help C.M.A. to sleep, specifically three times the appropriate dose of unprescribed medication; based on investigation, C.M.A. and H.W.A. were adjudicated dependent; concerns regarding Mother were mental health, parenting, and domestic violence; Mother was diagnosed with bipolar, ADHD, and OCD; Mother has a disease that could be fatal and communicable disease concerns existed surrounding visitation; Mother undressed the Children and took pictures and made S.L.W. sit on the toilet for an hour at visitation; Mother mocked staff and asked the Children about abuse at visitation; S.L.W. was adjudicated and committed due to unexplained bruises, and had many human bites all over her body. *See* Mother's Brief at 7-8 n.2 (citing N.T., 1/28/25, at 15-16, 19-25, 34-36).

To the extent that Mother objected on grounds other than hearsay with respect to her having a communicable disease and the bases for S.L.W.'s adjudication, any challenge would be waived. *See* N.T., 1/28/25, at 20-21, 24-25; Pa.R.A.P. 302(a) (providing for waiver of issues not first raised in lower court); *see also Interest of T.M.*, 239 A.3d 193, 201 (Pa. Super. 2020) ("[O]ur Supreme Court has frequently stressed the necessity of raising claims at the earliest opportunity to eliminate the possibility that an appellate court will be required to expend time and energy reviewing claims on which no trial [court] ruling has been made.") (citation and internal quotation marks omitted) (emphasis omitted).

In support of her argument, Mother relies upon ***A.J.R.-H.***, ***supra***, which involves the admissibility of documents under the business records exception to the hearsay rule. ***See*** Mother's Brief at 23. She argues that DHS failed to provide a foundation related to the timing of the preparation of the Agency's file and, importantly, that the Agency file relied upon by Mr. Bradham was never presented or entered into evidence. ***See id.*** Moreover, she contends that such testimony is potentially "double hearsay." ***Id.***

The trial court found that Mr. Bradham, the CUA supervisor and custodian of the documents, "provided sufficient information relating to the preparation and maintenance of the record to offset the hearsay character of the evidence" pursuant to the business records exception. Trial Court Opinion, 3/26/25, at 10. We disagree.

The Pennsylvania Rules of Evidence ("the Rules") establish that "relevant evidence" is generally admissible, so long as it concerns the underlying controversy and has probative value. ***See*** Pa.R.E. 401-402. The Rules, however, concomitantly prohibit the admission of hearsay, unless the evidence offered is subject to at least one of a limited number of exceptions. ***See*** Pa.R.E. 802-803; ***see also A.J.R.-H***., 188 A.3d at 1167. As noted ***supra***, "hearsay" is defined as a statement that "the declarant does not make while testifying at the current trial or hearing," and which "a party offers in evidence to prove the truth of the matter asserted in the statement." Pa.R.E. 801(c)(1)-(2).

Rule 803(6), the provisions of which are set forth **supra** at n.12, establishes the hearsay exception regarding business records. Pa.R.E. 803(6); **see also** 42 Pa.C.S.A. § 6108(b) ("A record of an act, condition or event shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business at or near the time of the act, condition or event, and if, in the opinion of the tribunal, the sources of information, method and time of preparation were such as to justify its admission."). "Where a hearsay document contains additional hearsay within it (often referred to as 'double hearsay'), each level of hearsay must satisfy an exception to the rule prohibiting the admission of hearsay evidence." **A.J.R.-H.**, 188 A.3d at 1169 (citations omitted).

In **A.J.R.-H.**, also an involuntary termination of parental rights proceeding, the subject child welfare agency introduced, and the court admitted over objection, 167 exhibits from various sources contained within the agency file without any testimony. **See id.** at 1160-62. In concluding that these exhibits were improperly admitted, our Supreme Court reasoned as follows:

> Without question, the manner in which these exhibits were admitted into evidence in the first instance failed to satisfy the requirements of the business records exception. CYS did not present any witness in support of the exhibits' admission, let alone "the custodian or other qualified witness." [**See**] 42 Pa.C.S.[A.] § 6108(b); Pa.R.E. 803(6)(D). Instead, all of the exhibits were presented to the court for admission, in bulk, by the county solicitor prior to calling any witnesses to testify. . . . There was

also no testimony of record that someone with knowledge created any of the 167 exhibits at or near the time of the event or that they were created in the regular practice of the various agencies from which the documents came. [*See*] 42 Pa.C.S.[A.] § 6108(b); Pa.R.E. 803(6)(A), (C). Additionally, none of the documents were certified copies. [*See*] Pa.R.E. 803(6)(D), 902(11). The only information provided at the time of the exhibits' admission was the county solicitor's assurance, in response to the leading question posed by the orphans' court, that the exhibits were contained in CYS's files and "were collected in the ordinary course of business with regard to this case." [*See*] 42 Pa.C.S.[A.] § 6108(b); Pa.R.E. 803(6)(B).

*Id.* at 1167–1168 (footnote omitted).

Preliminarily, here, it is not clear that DHS actually sought to introduce a "record" into evidence that would even qualify for the hearsay exception at Rule 803(6), as it relates to Mr. Bradham's testimony. *See* Pa.R.E. 803(6) (indicating that this exception applies only to "[a] record" of "an act, event or condition"). DHS did not proffer the underlying records as evidence but merely sought to have Mr. Bradham repeat information allegedly contained therein. In the absence of a document recording an act, event, or condition whose admission is being sought, it is unclear to this Court that Rule 803(6) would even apply. *See id.* However, even if Mr. Bradham's memory could have been subject to the business records exception, DHS failed to lay a proper foundation.

While Mr. Bradham testified that he was the CUA supervisor, DHS failed to obtain any additional foundational testimony that "satisfied any of the prerequisites for admission under Rule 803(6)." *A.J.R.-H.*, 188 A.3d at 1170. For instance, DHS failed to elicit any testimony related to time, method, or

mode of preparation of the Agency file. Only as to limited testimony regarding some of the visitation issues did Mr. Bradham volunteer, without any follow-up related to foundation, that there existed confirming documentation as part of the Agency's record. **See** N.T., 1/28/25, at 23. We, therefore, find that Mr. Bradham's testimony was hearsay and improperly admitted. **See A.J.R.-H.**, 188 A.3d at 1170; **see also** Pa.R.E. 803(6); 42 Pa.C.S.A. § 6108(b).

Having found that Mr. Bradham's testimony was erroneously admitted, as indicated *supra*, an evidentiary error is harmless if it "could not have had any impact upon the [trial] court's decision." **A.J.R.-H**., 188 A.3d at 1175. As our High Court has explained:

> [W]here, in light of the record as a whole, an erroneous evidentiary ruling could potentially have affected the decision to terminate a parent's rights to his or her child, an error is not harmless and the parent is entitled to a new hearing and decision. We arrived at this standard "[b]ecause of the serious impact attending the termination of parental rights," finding that "it is important that a judicial decree extinguishing such rights be based solely on competent evidence."

*Id.* at 1170-1171 (citations omitted, footnote omitted).

In **A.J.R.-H.**, based upon the court's "several general references to its review and reliance upon the exhibits," as well as its express "reli[ance] upon information presented solely through the exhibits" in its written opinion, the Court found that the trial court in fact relied on the improperly admitted evidence. *Id.* at 1171-72.

Further, noting that the subject evidence consisted of 1230 pages of documentation, the **A.J.R.-H.** Court determined that "the contested evidence

was unquestionably a much greater part of [the agency's] case in support of its petition to terminate" and "provided the foundation for the [trial] court to find clear and convincing evidence in support of termination under subsections (a) and (b) of the termination statute." *Id.* at 1175. As such, the Court concluded:

> Because the erroneous evidentiary ruling affected the [trial] court's decision to terminate Mother's parental rights to the Children, and the decrees were not based solely on competent evidence, the error of admitting the 167 exhibits was not harmless and we must remand the case for a new hearing on [the agency's] petition to terminate Mother's parental rights to the Children.

*Id.* (citation omitted).

In this case, however, we recognize that the testimony of Mr. Bradham surrounding the Children's adjudication and circumstances for coming into care, as well as Mother's behavior at and concerns regarding visitation, is corroborated by other evidence, notably the testimony of CUA case manager, Mr. Mollock, and Dr. Russell's parenting capacity evaluation, the admissibility of which have not been challenged in the instant appeal. Further, contrary to Mother's assertion otherwise, she did not object to the admission of the parenting capacity evaluation. *See* N.T., 1/28/25, at 73-74. As such, we find that any error in admitting Mr. Bradham's testimony was harmless, and Mother's claim fails.

**Due Process**

Finally, in her ninth, tenth, and eleventh issues, Mother asserts that her guarantee of due process under the Fifth and Fourteenth Amendments of the

Unites States Constitution, and Article I, Section 1 of the Pennsylvania Constitution, was violated. *See* Mother's Brief at 24. Specifically, Mother claims she was denied due process of law when the court denied her request to bifurcate the presentation of her case in order to facilitate the presentation of testimony from her current therapist, Barbara Johnson, who was unavailable on the scheduled date of trial. Mother's bifurcation request proposed that the court permit Ms. Johnson to testify on the same date as the continued involuntary termination proceeding scheduled for C.M.A.'s father. *See id.* at 24-25. The following colloquy is relevant:

> COUNSEL FOR MOTHER: Your Honor, if I may, I have a witness I subpoenaed who I've spoken with, and she's a material witness. She provided a report. I don't think [counsel for DHS] is going to be willing to stipulate to that report. I will get in contact with her, she said she had another obligation, I said –
>
> THE COURT: -- we're not continuing the case, [Counsel].
>
> [COUNSEL FOR MOTHER]: No, not continue the case but the bifurcation, I may be able to call that witness –
>
> THE COURT: -- we're going forward with [M]other's case in full today.
>
> [COUNSEL FOR MOTHER]: Well, she has a subpoena --
>
> THE COURT: -- it is your obligation to get the evidence here. This is marked must be tried.
>
> [COUNSEL FOR MOTHER]: Well, she's under subpoena, so have the sheriff's [department] go out and bring her.
>
> THE COURT: We're going forward. . . .

N.T., 1/28/25, at 9-10.

Mother argues that the court's denial "constituted a [breach] of fairness [pursuant to Mother's] right to due process" as Ms. Johnson was of "material import," for example to rebut the testimony of Dr. Russell. Mother's Brief at 25. She further contends that there would have been "zero prejudice" as the court had already continued the matter with respect to the father of C.M.A. *Id.* Mother states that "she was not in opposition [] to proceed[ing] forthwith[] but was merely [] requesting to leave the matter remain open just in order to produce our witness." *Id.*

In the absence of Ms. Jonson's testimony, Mother attempted to introduce her report through Dr. Russell and Ms. Luzzio, which the court denied due to lack of authentication. *See* N.T., 1/28/25, at 76-82, 87-90. In her brief, Mother appears to concede the lack of authentication of Ms. Johnson's report but challenges its omission on the basis of due process, contending that the prior dependency orders and parenting capacity evaluation were admitted without proper authentication. *See* Mother's Brief at 25.

"Due process requires nothing more than adequate notice, an opportunity to be heard, and the chance to defend oneself in an impartial tribunal having jurisdiction over the matter." *In re J.N.F.*, 887 A.2d 775, 781 (Pa. Super. 2005). "Due process is flexible and calls for such procedural protections as the situation demands." *In re Adoption of Dale A., II*, 683

A.2d 297, 300 (Pa. Super. 1996), *citing* **Mathews v. Eldridge**, 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976).

Further, with respect to bifurcation, we have stated:

Initially, we note that, "The decision whether to bifurcate is entrusted to the sound discretion of the trial court, which is in the best position to evaluate the necessity for such measures." **Gallagher v. Pennsylvania Liquor Control Bd.**, [] 883 A.2d 550, 557 ([Pa.]2005). Thus, the appellate court must determine if the trial court's bifurcation decision "is a reasonable exercise of its discretion in this respect." **Stevenson v. Gen. Motors Corp.**, [] 521 A.2d 413, 419 ([Pa.]1987). We will not find an "abuse of discretion unless the law has been overridden or misapplied or the judgment exercised was manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence in the certified record." **Biese v. Biese**, 979 A.2d 892, 895 (Pa. Super. 2009).

**Castellani v. Scranton Times, L.P.**, 161 A.3d 285, 297 (Pa. Super. 2017).

Here, we conclude that Mother has waived these claims for failure to develop any meaningful argument related thereto in her brief. Significantly, Mother supports her claim by nothing more than a mere fleeting reference to the most general of case law. *See* Mother's Brief at 24; **In re M.Z.T.M.W.**, 163 A.3d 462, 465-66 (Pa. Super. 2017) (restating that "this Court will not review an appellant's claim unless it is developed in the argument section of an appellant's brief, and supported by citation to relevant authority.") (citations omitted).

Even if not waived, such claims are without merit as Mother was clearly provided with notice and the opportunity to be heard and defend herself. Indeed, she was present and proffered both testimonial and documentary

evidence on her behalf. While the trial court denied her request for bifurcation, we discern no abuse of discretion. The court was entitled to do so given the multiple prior continuances and entreaties of counsel for DHS, the GAL, and legal interest counsel to proceed. Despite the court granting a continuance as to C.M.A.'s father, we note that his case was separable and distinct from that of Mother. Moreover, Mother's argument related to Ms. Johnson's report does not sound in due process and lacks merit to the extent that Mother, in fact, did not object to the admission of the parenting capacity evaluation. **See** N.T., 1/28/25, at 73-74. Accordingly, Mother is not entitled to relief.

**Conclusion**

As we discern no abuse of discretion or error of law, we affirm the decrees terminating Mother's parental rights to the Children pursuant to Section 2511(a)(2) and (b). **See Matter of Adoption of L.C.J.W**., 311 A.3d 41, 48 (Pa. Super. 2024) ("[A]bsent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand.").

Decrees affirmed.

Judge Dubow did not participate in the consideration or decision of this case.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>9/25/2025</u>